**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

EDWARD LEE,

                                        Plaintiff,

        - v -                                                    Civ. No. 5:15-CV-661
                                                                        (MAD/DJS)

CAROLYN W. COLVIN, *Acting Commissioner of*
*Social Security*,

                                        Defendant.

**APPEARANCES:**                              **OF COUNSEL:**

STANLEY LAW OFFICES, LLP                JAYA A. SHURTLIFF, ESQ.
*Attorney for Plaintiff*
215 Burnet Avenue
Syracuse, New York 13203

SOCIAL SECURITY ADMINISTRATION          DAVID L. BROWN, ESQ.
*Attorney for Defendant*
Office of Regional General Counsel
Region II
26 Federal Plaza – Room 3904
New York, New York 10278

**DANIEL J. STEWART**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

        In this action, Plaintiff Edward Lee moves, pursuant to 42 U.S.C. § 405(g), for review of a

decision by the Commissioner of Social Security denying his application for Disability Insurance

Benefits ("DIB").[1]  Based upon the following discussion, we recommend that the Commissioner's

decision denying Social Security benefits be **reversed and remanded**.

---

[1] This case has proceeded in accordance with General Order 18, which sets forth the procedures
to be followed when appealing a denial of Social Security benefits.  Both parties have filed Briefs,
though oral argument was not heard.  Dkt. Nos. 14, Pl.'s Br., & 19, Def.'s Br.

# I. BACKGROUND

The Court incorporates by reference the summary of the procedural history contained in the Plaintiff's Brief, as well as his statement of facts, with the exception of any arguments, inferences, or conclusions contained therein, as supplemented by the Defendant in her Brief. Dkt. No. 14, Pl.'s Br., at pp. 1-6; Dkt. No. 19, Def.'s Br., at p. 1 (incorporating the Plaintiff's and Administrative Law Judge's summaries of statements of facts and procedural history).

Lee, born on May 31, 1960, filed an application for DIB on February 29, 2012, claiming an inability to work as of October 2, 2009, due to a herniated disk, degenerative disk disease, and arthritis. Dkt. No. 8, Admin. Transcript [hereinafter "Tr."] at pp. 185-91, 207, & 219. He has an eleventh grade education and has not completed any type of specialized job training, trade, nor vocational school. *Id*. at pp. 59 & 220. His past work included construction work and stone cutting. *Id*. at pp. 60, 93, & 210.

Lee's disability application was denied on initial review. *Id*. at pp. 100-01. On January 8, 2014, a Hearing was held before Administrative Law Judge ("ALJ") Lisa Martin wherein testimony was procured from Howard Steinberg, a vocational expert ("VE"), and from Lee, who was accompanied by an attorney. *Id*. at pp. 53-99. Thereafter, on March 24, 2014, ALJ Martin issued an unfavorable written decision finding that Lee was not disabled. *Id*. at pp. 19-33. On May 7, 2015, the Appeals Council determined that there was no basis under the Social Security Regulations to grant Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the Commissioner. *Id*. at pp. 1–6. Exhausting all of his options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied. *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325–26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). Succinctly defined, substantial evidence is "more than a mere scintilla" of evidence scattered throughout the administrative record; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *see also Williams ex. rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex. rel. Williams v. Bowen*, 859 F.2d at 258.

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d at 258; 42 U.S.C. § 405(g). However, where the weight of the evidence does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson v. Bowen*, 817 F.2d at 986.

## B. Determination of Disability

To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. *Id*. at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. § 404.1520. At Step One, the Commissioner "considers whether the claimant is currently engaged in substantial gainful activity." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends. 20 C.F.R. § 404.1520(b). If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. *Id.* at § 404.1520(c). If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations. *Id*. at § 404.1520(d). The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience. *Berry v. Schweiker*, 675 F.2d at 467. Where the claimant has such an impairment the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity. *Id*. If the claimant's impairment(s) does not meet or equal the listed

impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity ("RFC")[2] to perform his or her past relevant work despite the existence of severe impairments. 20 C.F.R. § 404.1520(e). If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy. *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 404.1520(g).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four). *Berry v. Schweiker*, 675 F.2d at 467. If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy. *Id.*; 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. § 404.1520(f); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

## C. ALJ Martin's Findings

As noted above, Lee and a VE were the only witnesses to testify at the Hearing. Tr. at pp. 53-99. In addition to such testimony, the ALJ had Lee's medical records. *Id.* at pp. 248-511. In her written decision, dated March 24, 2014, ALJ Martin noted initially that, for DIB purposes, Lee met the

---

[2] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 404.1545(a).

insured status requirements of the Social Security Act through December 31, 2014. *Id*. at pp. 22 & 24. Using the five-step disability evaluation, ALJ Martin found that: (1) Lee had not engaged in any substantial gainful activity since October 2, 2009, the alleged onset disability date; (2) he has severe medically determinable impairments, namely cervical and lumbar spine disorders; (3) his severe impairments do not meet nor medically equal any impairment listed in Appendix 1, Subpart P of Social Security Regulation No. 4; (4) he retains the RFC to perform the full range of light work, as defined by the Regulations, with certain additional limitations, and as such, he could not return to any of his prior work; but, (5) considering his age, education, work experience, RFC, the VE testimony, and using the Medical-Vocational Guidelines as a framework, Lee could perform work that is available in the national economy and is therefore not disabled. *Id.* at pp. 19-33.

### D. Plaintiff's Contentions

In his Brief, Plaintiff challenges several aspects of the ALJ's decision. Dkt. No. 14, Pl.'s Br. Primarily, Plaintiff's arguments revolve around his sentiment that his RFC should have been assessed at the sedentary level, for which, based upon his age, the Medical-Vocational Guidelines (the "Grids"), and the testimony of the VE, a finding of disability would be directed. In challenging the ALJ's RFC assessment, Plaintiff argues that the ALJ failed to give controlling weight to Plaintiff's treating physician, Charlotte Hawkins, M.D., and incorrectly discounted Plaintiff's credibility. Plaintiff also criticizes the ALJ's mechanical application of the Grids at Step Five. And, because in his estimation the ALJ erroneously assessed his RFC, Plaintiff argues that the hypotheticals relied upon by the VE at the Hearing rendered the Step Five determination erroneous.

### 1. RFC Determination

At the time Plaintiff's alleged disability began in October 2009, he was roughly seven months

shy of his 50th birthday. Tr. at pp. 55 & 185. At the time of Plaintiff's alleged onset disability date, he was working as a stone cutter for a company that made stone and granite kitchen counter tops. Tr. at p. 413. Due to the repetitive lifting, pushing, and pulling activities, he began to experience strain in his lower back, which worsened over time into severe back pain. An x-ray taken on October 12, 2009, days after the alleged onset disability date, revealed mild degenerative disc disease with endplate spurring at the L1-2, L2-3, L5, and S1 levels. *Id.* at pp. 256-57.

Lee then began treating with Thomas Haher, M.D., an orthopedic specialist. Due to the severity of the pain, Lee was told by Dr. Haher on November 9, 2009, not to return to work and to continue with physical therapy. *Id.* at p. 373. Plaintiff continued treatment with Dr. Haher, however, the conservative treatment modalities, including pain management through a TENS unit, injections, and physical therapy, did not result in improvement. *Id.* at pp. 336-37, 339-40, 343, 345, 351, & 357.

An MRI conducted on April 30, 2010, revealed degenerative disc changes most severe at L5/S1, with significant loss of disc height at that level with circumferential bulging and end plate spurs; there was also severe left and moderate right foraminal narrowing with the L5 nerves in contact with disc and spurs and mild indentation of anterior thecal sac with right S1 nerve contacting the disc. *Id.* at pp. 354-55. Disc bulging with contact on the nerve was also noted at L3-4 and L4-5. *Id.*

On May 7, 2010, in connection with his Workers' Compensation claim, Plaintiff was examined by Jalal Sadrieh, M.D. *Id.* at pp. 413-15. After examining Plaintiff and reviewing certain medical records, Dr. Sadrieh opined that Plaintiff could "return to work as long as he avoids heavy lifting of more than 20-25 lbs., frequent bending, pulling and pushing" and he determined that Lee could "do some housework and activities of daily living." *Id.* at p. 415. Dr. Sadrieh further noted that Plaintiff's condition was a degenerative process that "should be considered an evolving condition of the lower

back and degenerative process of the lower back." *Id.*

In addition to treating with Dr. Haher, Plaintiff regularly saw Charlotte Hawkins, M.D., his primary care physician, and Margaret A. Downing, P.A., who was part of the same practice group. *See id.* at pp. 376-88 & 451-82 (medical records spanning September 2005 through January 2014). Progress notes from this office reveal a deterioration of Lee's condition, culminating in an antalgic gait, moderate spasm of the lumbar paravertebral muscles bilaterally, moderate limitation with forward flexion, and an inability to hyperextend due to pain. *Id.* at pp. 381, 452, 465, 469, & 467.

In October 2013, Plaintiff reported falling down twelve stairs. *Id.* at p. 457. An MRI of the lumbar spine, taken on December 5, 2013, revealed chronic advanced degenerative disc disease at the L1-L2 through L5-S1 levels and bilateral facet arthropathy at the L3-L4, L4-L5, and L5-S1 levels. *Id.* at p. 484. There were also small disk herniation noted at these levels, and left L2-L3 neural foraminal disc herniation compressing the L2 nerve root. *Id.* In an examination conducted by P.A. Downing on December 9, 2013, Plaintiff complained of worsening pain in his back and neck. *Id.* at p. 455. He was observed to be uncomfortable, tired, and walked with a "markedly" antalgic gait. *Id.* at pp. 455-56. Upon physical examination, Lee had moderately limited range of motion and was unable to externally rotate his hips without "significant" discomfort; Oxycodone was prescribed in addition to continuing other medication he had been taking for muscle spasms, including TENS unit, Omeprazole, Savella, and Methocarbomol. *Id.* at pp. 451& 456. On January 14, 2013, Plaintiff reported worsening lumbar pain since the onset of the winter months, as well as fatigue. *Id.* at p. 465. He also reported that he experienced intermittent arm cramping and numbness bilaterally when he had fished during the past year. *Id.*

An x-ray of Lee's cervical spine, conducted on January 14, 2013, revealed osteoarthritic

changes most marked at C5-C6. *Id.* at p. 488. An MRI of the thoracic spine, performed on the same date, revealed mild degenerative disc disease most marked in the lower thoracic spine. *Id.* at p. 510. An MRI of the cervical spine, taken on March 27, 2013, revealed moderate-to-severe osteoarthritic changes, most marked at C3-C4 vertebral body endplates, followed by C4-C5 and C5-C6. *Id.* at pp. 508-09. Degenerative osteophyte formation was seen at C3-C4 resulting in mild central canal stenosis; severe left lateral recess narrowing and moderate right lateral recess narrowing; and degenerative osteophyte formation at C4-C5 and C5-C6 resulting in mild central canal stenosis and moderate bilateral lateral recess narrowing. *Id.* at p. 509. Left paracentral disc prtorusion was seen at T1-T2 resulting in moderate left lateral recess narrowing. *Id.*

In addition to the treatment notes and objective clinical test results, the record contains a medical source statement from Dr. Hawkins's office,[3] dated January 3, 2014. *Id.* at pp. 479-82. Therein, Lee is assessed to be limited to lifting and carrying less than ten pounds and standing and walking less than two hours in an eight-hour workday with periodic alternating of sitting and standing. *Id.* at pp. 479-80. In support of this assessment, Dr. Hawkins cited the MRIs conducted of the lumbar spine on December 5, 2013, showing advanced degenerative disc disease and disc herniation at L2-L3 compressing nerve root, and of the cervical spine on March 27, 2013, revealing severe osteoarthritis at C3 through C6 with bilateral nerve compression at C3-C4, C4-C5, C5-C6, and central canal stenosis. *Id.* at p. 480. It was further opined that Lee could never climb ramps, stairs, ladders, ropes, or scaffolds, never kneel, crouch, crawl, or stoop, and could occasionally balance. *Id.* In support of this finding, it was noted that Lee displayed limited range of motion at the lumbar spine; forward flexion

---

[3] The medical source statement is signed by P.A. Downing; however, the ALJ treats this assessment as representing Dr. Hawkins's opinions and therefore I treat them as submitted by Dr. Hawkins. *Compare* Tr. at p. 482 *with* Tr. at pp. 27 & 28.

was less than 90°; he is unable to hyperextend; and lateral bending and rotation at waist are limited due to pain and spasm. *Id*. Lee's manipulative abilities were determined to be limited, specifically, with regard to his ability to reach, handle, and finger due to nerve compression from cervical spine arthritis and because both upper extremities have motor sensory defects. *Id*. at p. 481. Lastly, it was noted that Lee had several limitations when it came to environmental exposure due to his extensive spine arthritis and disc degeneration wherein he has muscle spasms with temperature extremes, especially low temperatures, and because coughing with fumes and dust can exacerbate his pain. *Id*. at p. 482.

As noted above, the Commissioner assesses a claimant's RFC as a basis for determining the particular types of work the claimant may be able to do despite the existence of physical and/or mental impairments. *See* 20 C.F.R. § 404.1545(a); 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c). In qualifying work in the national economy, the Regulations classify and define jobs according to their physical exertion requirements as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the plaintiff's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id*. at § 404.1545(a).

After reviewing the entire record, the ALJ determined that Lee had the RFC

to perform a full range of light work as defined in 20 CFR 404.1567(b), except [Lee] needs a sit-stand option with a change of position for brief periods (one to two minutes) as often as every 30 to 60 minutes. [Lee] is precluded from climbing ladders[,] ropes[,] and scaffolding and performing more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. [Lee] is further limited to no more than occasional overhead reaching tasks and no constant upper extremity reaching, handling, fingering, and fe[e]ling tasks. [Lee] must also avoid dangerous work hazards (including unprotected heights and exposed machinery). Because of pain and symptom exacerbation preventing detailed decision making, [Lee] is limited to routine, uninvolved tasks not requiring a fast assembly quota pace.

Tr. at pp. 24-25.

In rendering this RFC, the ALJ gave little weight to the medical source statement rendered by Dr. Hawkins, finding that the limitations contained therein were not only inconsistent with her findings during examinations but were also inconsistent with the Plaintiff's statement of activities and inconsistent with an earlier functional capacity evaluation conducted by Dr. Sadrieh in conjunction with Plaintiff's Workers' Compensation claim. *See* Tr. at pp. 26-28; *compare* Tr. at pp. 413-15 *with* Tr. at pp. 479-82. The ALJ also determined that Lee's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. *Id*. at p. 26. I find that in rendering her RFC assessment, the ALJ erroneously applied the Treating Physician Rule and inappropriately discounted Lee's credibility.

Under the Regulations, a treating physician's opinion as to the nature and severity of a claimant's impairment is entitled to "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record[,]" including the opinions of other medical experts. 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).[4] Where conflicts arise in the medical evidence, resolution of such is properly entrusted to the Commissioner. *Veino v. Barnhart*, 312 F.3d at 588 (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)).

In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may

---

[4] A "treating physician" is the claimant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or had an ongoing treatment and physician-patient relationship with the individual." *Jones v. Apfel*, 66 F. Supp. 2d 518, 524-25 (S.D.N.Y. 1999) (quoting *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)).

consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]" *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. § 404.1527). An ALJ may not "arbitrarily substitute his own judgment for competent medical opinion." *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983); *see also Rosa v. Callahan*, 168 F.3d at 79. The ALJ must properly state the reasons for giving less than controlling weight to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart*, 362 F.3d at 32. Failure to apply the appropriate legal standards for considering a treating physician's opinion is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of a treating physician's opinion. *Johnson v. Bowen*, 817 F.2d 983, 985-86 (2d Cir. 1987); *see also Barnett v. Apfel*, 13 F. Supp. 2d at 316-17.

In the case at hand, Lee's treating physicians provided an assessment of Plaintiff's capabilities and such assessment was well supported by the record, including progress notes, objective medical tests, and clinical findings. Pointedly, Dr. Hawkins's assessment was rendered in January 2014, after years of treating Plaintiff for his back condition which clearly, as demonstrated by the MRIs, had deteriorated over time, especially after he slipped and fell down the stairs in October 2013. Dr. Sadrieh's opinion, on the other hand, was rendered in March 2010, and even at that time, Dr. Sadrieh recognized that Lee's degenerative process would evolve over time. *Id*. at p. 415. In her argument to this Court, the Commissioner defends the ALJ's treatment of Dr. Hawkins's assessment due to the fact that she is not a specialist. However, the ALJ did not cite this reasoning as a basis for rejecting the opinion, and thus, the Court will not consider this argument. It further appears that not only did the ALJ discount Dr. Hawkins's opinion based upon the comparison to Dr. Sadrieh's earlier opinion, but

also because it did not comport with the ALJ's assessment of Plaintiff's statement of activities. Which brings me to the second error committed by the ALJ: the assessment of Plaintiff's credibility.

Where, such as here, "an underlying medically determinable physical or mental impairment[]. . . that could reasonably be expected to produce the individual's pain or other symptoms" is found, the ALJ must then "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Social Security Ruling No. 96-7p, *Policy Interpretation Ruling Titles II And XVI: Evaluation Of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements*, 1996 WL 374186, at *2 (S.S.A. 1996). "It is well settled that 'a claimant's subjective evidence of [symptoms] is entitled to great weight' where . . . it is supported by objective medical evidence." *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)). However, in a case where subjective symptoms are identified, "the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the pain alleged." *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y 1987). Where the ALJ resolves to reject subjective testimony with regard to pain and other symptoms, he or she "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his [or her] determination is supported by substantial evidence." *Id*. at 608 (citing, *inter alia*, *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1045 (2d Cir. 1984)). In evaluating a claimant's subjective complaints of symptoms, an ALJ must consider several factors set forth in the Regulations including:

(i)     [The claimant's] daily activities;

(ii)    The location, duration, frequency, and intensity of [claimant's] pain or other

> symptoms;
> (iii)   Precipitating and aggravating factors;
> (iv)   The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms;
> (v)    Treatment, other than medication, [claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms;
> (vi)   Any measures [claimant] use[s] or ha[s] used to relieve [his or her] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii)   Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms he alleged, but his statements regarding the intensity, persistence, and limiting effects of such symptoms were deemed not entirely credible. In the ALJ's opinion, Plaintiff maintained a "pretty active life style" wherein he hunted and fished. Tr. at p. 27. With regard to the hunting activities, the ALJ explained that Lee

> testified he had been hunting two times in the year so far[5] and had continued both bow and gun hunting since initial injury. On the two occasions that the claimant had been hunting so far in the year, he testified he was out for two hours.

*Id*.

The ALJ also determined that Lee's testimony regarding his lifting abilities was inconsistent with his fishing activities:

> [Lee's] testimony regarding the fishing activities seem inconsistent. First, [Lee] testified he is able to get up and down in his fishing boat and move about due to his pain. However, [Lee] also testified that he had trouble lifting the boat's 10 pound anchor. A boat that can handle constant movement likely would have an anchor weighing more than 10 pounds or the claimant does not need to get up and down as much as he alleged.

*Id.*

---

[5] It was clarified at the Hearing, which took place on January 8, 2014, that by this statement, Lee was referring to the amount of times he hunted in 2013, not 2014. Tr. at p. 66.

Not only did the ALJ misstate Lee's testimony with regard to his fishing and hunting activities, but the ALJ's conjecture as to a perceived inconsistency was completely inappropriate, especially in light of the fact that the ALJ never questioned Lee about the parameters of his boat and instead made assumptions based upon no known facts.

Contrary to the ALJ's characterization, Lee testified that his abilities to fish and hunt, two of his favorite pastimes, had deteriorated to the point where he realized he could not safely engage in either of those activities. *Id*. at p. 82. During the Hearing, a discussion ensued between the ALJ and Lee wherein Lee was discussing the side effects of his back and neck impairments, including cramping and numbness in his shoulders, wrists, and hands. *Id*. at p. 64. Lee explained that he would "once in a while" go fishing with his son, but would get to the point where he'd have to put the fishing pole down because he could not "reel it or pull back on it." *Id*. at pp. 64-65. Similarly, with regard to hunting activities, Lee explained how he had come to terms with the fact that he could no longer do that cherished activity like he used to. During the Hearing, the following colloquies ensued:

> ALJ: [W]hen's the last time you did an activity like fishing?
> Lee: Last year, but I don't do very much of it any more. The last couple of years, my fishing and hunting activities, which are my favorite, I just have not had much control over anything. Hills and inclines bother me real severe. And the fact that my hands coming and going. I just – I don't have much confidence. And I can't deal with different weather situations and stuff like that because it has a lot of effect on my body.

*Id*. at p. 65.

* * * *

> ALJ: So same question for hunting, when's the last time you went hunting?
> Lee: I might have went twice this year. And the last time I went, I was only out for about an hour and a half. And I sat down. And when I got up, I had to hold the gun in one hand, and the tree in the other to force myself up off the ground. And then I had to stand there a good five minutes to get bearings and let the pain kind of relieve before I could carry on. So basically, I've, in a sense had – I'm having to give that up, too.
> ALJ: Okay. When you say two times this year, do you mean 2013, right?
> Lee: Yes, ma'am. . . .

*Id*. at p. 66.

****

ALJ:    Okay. And just to make sure I understand. Do you – do you do gun hunting, or bow hunting only, or both? What type of hunting are you talking about? . . . .

Lee:    Yes, I've always done both. But like I said this year was the worst year I've ever had as far as spending time in the outdoors. I just, you know, the inclines, and problems with my arms and hands. I'm basically, facing reality that I'm not going to be able to do it.

*Id*. at pp. 66-67.

Upon further questioning, Lee explained that he could no longer hunt out of trees because climbing was not an option for him any longer and that he had not hunted out of a tree in over two years. *Id*. at p. 67. Later in the Hearing, Lee explained the trouble he has lifting things and gave an example that he could no longer lift the anchor in his boat and that his son has to do it for him. *Id*. at p. 73. The ALJ responded: "Okay. And so I don't know how much an anchor is. But I'm going to guess it's more than 10 pounds?" *Id*. Lee quickly corrected her and explained that it was exactly ten pounds. *Id*. Later, in response to questioning by Lee's attorney, Lee explained that the two times he went hunting in 2013 he was out for "two hours max" each time and that he did not feel well while hunting due to pain in his spine; whereas before his back impairments occurred, he would hunt "all day." *Id*. at pp. 76 & 80. Similarly, with regard to fishing, Lee explained that he used to participate in eight-hour fishing tournaments, but could never consider doing "even half of that" and instead can only fish for an hour or two, and with difficulty. *Id*. at pp. 80 & 81. He also explained that he alternated between standing and sitting because he had a boat "where you can get up and move around the boat comfortably[.]" *Id*. at p. 81.

Nevertheless, in her written decision, ALJ Martin determined that not only were Plaintiff's statements regarding his limitations not fully credible, but his doctor's opinion was similarly not credited because it was inconsistent with the ALJ's perception of the Plaintiff's activities. Because of

*-16-*

these findings, she assessed that Lee could perform the full range of light work, with some additional limitations outlined above. The Regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Yet, it is Plaintiff's contention that he cannot perform light work, as defined by the Regulations, and instead his abilities would be relegated to sedentary work, with other additional limitations. Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Id*. at § 404.1567(a).

After reviewing the medical record, I find that the ALJ did not apply the Treating Physician Rule correctly and she incorrectly assessed Plaintiff's credibility based upon assumed, and very possibly erroneous, facts. Had she properly credited Plaintiff's subjective statements regarding the limiting effects of his conditions, and Dr. Hawkins's well supported opinion, then it conceivably could be found that Plaintiff could perform the full range of sedentary work, which he concedes he can, with similar additional limitations. Therefore, I find that in determining Lee's RFC, the ALJ did not apply the correct legal principles and her assessment is not supported by substantial evidence. Despite Plaintiff's concession regarding sedentary work, the Court is not prepared to make the determination

that Plaintiff retained the RFC to perform sedentary work, and instead would remand this matter back to the SSA for further consideration.

## 2. Age as a Vocational Consideration

At Step Five, in discussing Plaintiff's vocational factors, the ALJ noted that Lee, as of the alleged onset disability date, was 49 years-old and considered a younger individual (age 18-49), he had a limited education, and could communicate in English. Because the ALJ determined that Lee could not perform the full range of light work, as defined by the Regulations, but instead had additional non-exertional limitations, the ALJ looked to the testimony of the VE, and ultimately determined that Lee could perform other work that was available in the national economy. Tr. at pp. 28-30.

Because of the errors committed with regard to Plaintiff's RFC assessment, the Court cannot evaluate whether the Commissioner carried her burden at Step Five. Nevertheless, there is one aspect of the ALJ's Step Five analysis that must be addressed, namely, Plaintiff's appropriate age category.

At Step Five of the sequential disability evaluation, the Commissioner bears the burden of proving that despite the claimant's severe impairments, he is capable of performing work that is available in the national economy. 20 C.F.R. § 404.1520(f). Ordinarily, if a claimant suffers solely from exertional impairments, the Commissioner meets her burden at the fifth step by resorting to the applicable Medical-Vocational Guidelines ("the Grids"). *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); 20 C.F.R. §§ 404.1569 & 404.1569a. The Grids place claimants with severe exertional impairments who can no longer perform past relevant work into categories according to their RFC, age, education, and work experience (*i.e.*, skilled or unskilled as well as transferability of skills). 20 C.F.R. Pt. 404, Subpt. P, App. 2; *see also Clark v. Barnhart*, 2003 WL 221397777, at *4-5 (E.D.N.Y. Sept. 16, 2003); *see also Rosa v. Callahan*, 163

F.3d at 82 ("For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled.").

The Regulations note that age, meaning a claimant's "chronological age", is one factor considered by the SSA in determining whether a claimant can make an adjustment to other work. 20 C.F.R. § 404.1563(a). The Regulations set forth age categories ranging from "younger person" for individuals under 50, "person closely approaching advanced age" for individuals aged 50-54, and "person of advanced age" for individuals age 55 and older. *Id*. at § 404.1563(c)-(e). The different age categories reflects the SSA's understanding that "older age is an increasingly adverse vocational factor for persons with severe impairments. . . . [and that t]he chronological ages 45, 50, 55 and 60 may be critical to a decision." Social Security Ruling No. 83-10, *Program Policy Statement Titles II And XVI: Determining Capability to do other Work – The Medical-Vocational Rules of Appendix 2*, 1983 WL 31251, at *8 (S.S.A. 1983).

Of critical importance here, the SSA is supposed to apply <u>each</u> age category that applies "during the period for which [it] must determine if [a claimant] is disabled." 20 C.F.R. § 404.1563(b). And, the SSA "will not apply the age categories mechanically in a borderline situation." 20 C.F.R. § 404.1563(b). For example, if a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled, [the SSA] will consider whether to use the older age category after evaluating the overall impact of all the factors of [a] case." *Id*.; *see also* S.S.R. 83-10, 1983 WL 31251, at *8 (providing the example that an individual with a chronological age of 54 years and 11 months could be in the category of advanced age (55 or older) instead of closely approaching advanced age (45-49)).

In this action, Lee, who was born on May 31, 1960, was 49 years, 4 months, and 2 days old on

October 2, 2009, the date of his alleged onset disability date. At the time of Dr. Sadrieh's examination, Lee was thirteen days short of his 50th birthday, and at the time of the ALJ Hearing, which was held on January 8, 2014, Lee was 53 years, 7 months, and 9 days old. While the ALJ noted at the Hearing that this was a borderline case, she nevertheless mechanically, without any discussion, characterized Lee as a younger individual because he was 49 years old as of the date the alleged disability began. Tr. at p. 28. Yet, the core issue for this disability determination is whether Lee can establish he was disabled at any time during the period from October 2, 2009, the alleged onset disability date, through December 31, 2014, the date Lee was last insured for disability benefits. Clearly Lee fell into two age categories during this time period and the failure to consider which age category most appropriately applied was an error.

This is particularly important if it is determined that Lee is relegated to sedentary work and is found to be more properly placed in the category of approaching advanced age. The Regulations recognize that individuals approaching advanced age "may be significantly limited in vocational adaptability if they are restricted to sedentary work." 20 C.F.R. Part 404, Subpt. P, App. 2, Rule 200.00(g). Where a claimant is able to perform sedentary work, having a category of closely approaching advanced age versus younger person is the difference between being disabled under Rules 201.09 and 201.10 and being not disabled under Rules 201.18 and 201.19. 20 C.F.R. Part 404, Subpt. P, App. 2, Table No. 1. It is evident that this case is a borderline case wherein the age categories should not have been applied mechanically, especially where application of the older age category could result in a finding of disability. 20 C.F.R. § 404.1563(b). Upon remand, the Commissioner should be directed to treat Plaintiff's case as a borderline case and to consider which age category Plaintiff properly fits into.

### III. CONCLUSION

In determining the final disposition of this matter, the most equitable judgment must be implemented. The court has authority to reverse with or without remand. 42 U.S.C. § 405(g). Remand is appropriate where there are gaps in the record or further development of the evidence is needed. *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997) ("Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order.") (cited in *Rosa v. Callahan*, 168 F.3d at 82-83). "Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally . . . remand the matter to the Commissioner for further consideration." *Curry v. Apfel*, 209 F.3d at 124 (citation omitted). Accordingly, because the ALJ failed to properly assess Lee's RFC and because she incorrectly mechanically applied the Grids, this case should be remanded to the Commissioner to further consideration.

**WHEREFORE**, in light of the above, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying disability benefits should be reversed and this matter should be remanded to the SSA; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. §

636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:   June 1, 2016
        Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge